IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MIDDLE DIVISION

MARCELLUS BREACH (AIS# 160710),  §
                                  §
          Plaintiff,              §
                                  §
vs.                               §     CIVIL ACTION NO. 2:06cv1133-MEF
                                  §
PRISON HEALTH SERVICES, INC.;     §
et al.;                           §
                                  §
          Defendants.             §

## NOTICE OF FILING

COME NOW the Defendants, Prison Health Services, Linda Lawrence, Michael Catalano, Rick Dull, Martha Jane Haynes, Michael E. Robbins, M.D., Bradford Adams, and Dr. William D. Hobbs (collectively "PHS Defendants"), by and through counsel, and in response to Court Doc. No. 543 and does enclose a copy of the "reviewed material" referenced in Dr. Hobbs' affidavit.  For the record, said documents are not organized, organized numerically, and the production constitutes what appears to be at least three (3) to five (5) separate groupings of documents, which constitute the "reviewed material" from Dr. Hobbs.  There are pages that appear to be missing from the production, but said pages were missing at the time they were reviewed by Dr. Hobbs and no other documents were included in the "reviewed material" outlined in Dr. Hobbs' affidavit.

A copy of the "reviewed material" is being maintained by PHS.  The only document that has not been produced is the fax cover sheet of the "reviewed material" when it was sent to defendant counsel's paralegal, Susan Green, on or about November 7, 2007.

1

Respectfully submitted this 9th day of April, 2008.

/s/ PAUL M. JAMES, JR. (JAM017)
Attorney for Defendants, Prison Health
Services, Linda Lawrence, Michael
Catalano, Rick Dull, Martha Jane
Haynes, Michael E. Robbins, M.D.,
Bradford Adams, and Dr. William D.
Hobbs

OF COUNSEL:

RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
P. O. Box 270
Montgomery, AL 36101-0270
(334) 206-3148
(334) 481-0817 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served by U.S. Mail this the 9th day of April, 2008, to:

Mr. Marcellus Breach (#160710)
Limestone Correctional Facility
28779 Nick Davis Road
Harvest, AL 35749

The Clerk of Court, using the CM/ECF system will send notification of this filing to the following:

Albert Sims Butler, Esq.
ALABAMA DEPARTMENT OF CORRECTIONS
P. O. Box 301501
Montgomery, AL 36130-1501

Philip G. Piggott, Esq.
STARNES & ATCHISON, LLP
P. O. Box 598512
Birmingham, AL 35259-8512

/s/ PAUL M. JAMES, JR. (JAM017)
OF COUNSEL



## State of Alabama
## Alabama Department of Corrections

301 South Ripley Street
P. O. Box 301501
Montgomery, AL 36130



Bob Riley
Governor

Richard F. Allen
Commissioner

---

**Date:**    February 26, 2007

**To:**    Prison Health Services (PHS) Statewide and Regional Management
PHS – Facility Physicians and Practitioners
PHS – Facility Health Services Administrators

**From:**    Ruth A. Naglich
ADOC Associate Commissioner
Office of Health Services

**Re:**    Individual Inmate Medical Profile Request

It has come to my attention that there may be some confusion surrounding the prescribing or recommendations for inmate medical profiles at the institutional level. Therefore, I am providing the following information as a means of clarification.

➢ All inmates initiated Medical Profile requests must be submitted via a Sick Call form and scheduled to see the provider. All requests will be subject to a $3.00 co-pay; regardless of whether or not a special need profile is granted. The only exception to the initial co-pay will be for those Medical Profiles that are related to permanently and physically debilitating conditions that are beyond the inmate's control.

➢ The order for an individual inmate to receive a special request or profile, must be reviewed and processed based on the physical needs of the inmate as assessed by their primary facility physician or practitioner.

➢ Any assessment that results in a medical profile must be based on an actual patient encounter that is documented in the medical record.

---

Alabama Department of Corrections

Telephone (334) 353-3883          Fax (334) 353-3967

- 1 -

➢ A complete assessment of the physical limitation or medical treatment that has facilitated the request for a "profile" must be documented in the medical record in the physician progress notes.

➢ Medical Profiles must be renewed every 90 days and follow a new evaluation based on a physical exam.

➢ Inmates are to submit a sick call request and present themselves to the medical unit to have their 90 day profiles renewed. Medical Profiles that are not related to the treatment of an on-going chronic care illness or a permanent physical disability will be subject to a $3.00 Co-Pay at the time of renewal.

➢ The only exception to the 90 day renewal rule will be in cases where inmates require a specific profile, as a result of a permanent or debilitating physical condition that is documented as part of their own going treatment plan to be updated annually. These profiles will be renewed annually at the time of a physical exam and are not subject to any Co-pay fee.

Dr. Lyrene has shared a form he used in the past to assist in the evaluation of the necessity of a special profile in the treatment of an inmate within the prison. The form focuses some of the responsibility back on the inmate in making the assessment. If these forms assist the provider in the management of these requests, then please utilize them. However, these forms are not to take the place of a face to face assessment for the inmates needs. In addition, they do not replace the final utilization or prescribing decision by the on-sight physician.

The appropriate prescribing of a Medical Profile as part of an on-going treatment plan is an acceptable practice. However, miss-use or over prescribing of these profiles is just as irresponsible as the over prescribing of medication. It can lead to manipulation of the providers by other inmates and security staff, given the space and budgetary limitations of the ADOC. If an inmate is requesting a Medical Profile that is not deemed appropriate or needed in treatment and is verbally or physically threatening the provider over the decision, then this behavior is to be reported to the Warden immediately. Subsequently, this behavior should also be noted in the medical record.

CC:    Kim Thomas, ADOC General Counsel
       Dr. George Lyrene, ADOC Consulting Medical Director
       ADOC-OHS Management Staff

Alabama Department of Corrections

Telephone (334) 353-3883       Fax (334) 353-3967

- 2 -

Re: Covered Services

One of the perennial issues in correctional health has to do with entitlement. There are three tiers of health care issues which must be recognized in attempting to provide reasonable and adequate care for a population. The first tier is populated by those issues which must be managed aggressively and urgently. In this category would be a heart attack, a severe asthma attack, bleeding, etc. The second tier would consist of those things which need to be managed, not because they present immediate danger to the patient's health but because if ignored for a long period of time might result in a problem down the road. Such would be high blood pressure or high sugar or HIV, etc. The third category consists of issues which present much demand on the system and are highly demanded by patients but the omission of which would not result in danger or deterioration to the health of the patient. Such are artificial limbs or other prostheses, repair of old injuries to knees as are often seen in young athletes, correction of old fractures that may have not healed straight, removal of benign (noncancerous) growths, etc. This last category has often been seen as an entitlement by inmate patients. There are states where services such as these are not covered by standard Medicaid and are thus not available to the indigent law-abiding citizens. Services in this arena account for as much as 15-20% of specialty and hospital costs. The health of the inmate population would not be compromised by creating a policy supported by the state in which these were designated as non-covered services for that population. It is generally not the expectation of the citizens whose resources are being expended that the inmate population be provided with these types of services. A list of such commonly expected services and general guidelines to describe others could easily be generated.

The unanswered question to be faced in this effort comes back to the question of entitlement. It is commonly assumed that health care entitlement has been defined for the community and that "community standard" can be used to define the same for the incarcerated population. In fact there is no "community standard" for health care entitlement. When one appears at a surgeons office for anything other than a tier one problem above, one's entitlement is defined by one's insurance or guarantee of payment. In the absence of those there is no such thing as an accepted health care entitlement for the non-offending U.S. citizen for anything other than acute emergencies.

The following are health-related issues frequently presenting to health providers in corrections for which a non-covered status would not have severe consequences to the health of the patient:

HEENT:

Alopecia (hair loss either patchy or generalized)
Dandruff
Hearing impairment which does not interfere with normal conversation
Ocular prostheses
Cataract in one eye with no complicating eye disease
Contact lenses, tinted lenses or prescription sunglasses, unless medically
necessary. To be considered medically necessary the condition
must be one which will deteriorate if the prescription is not provided.
Radial keratotomy.

Nasal septal deformity usually due to old fracture
Non-obstructive acute nasal fracture

Orthopedic

Uncomplicated fractures of metacarpal can be treated with casting
Hip arthroplasty
ACL repairs of knee
Knee arthroplasty
Minor tendon injuries as to distal fingers
Old orthopedic injuries with unresolved cosmetic healing.
Prosthetic limbs
Special shoes where comfort is the only issue (no complications from
regular well-fitted shoes.
Acromial-clavicular separation
Shoulder instability unless repeated episodes
Surgical evaluation of disc disease in first 6 months unless neurological
defecits.
Surgical evaluation of disc disease present for 1 year or more prior to
incarceration unless neurological defecits.

General Surgery

Non-incarcerated, non-strangulated inguinal hernia during first year of
incarceration.
Uncomplicated ventral hernias
Lipomas
Uncomplicated sebaceous cysts
Circumcisions unless complicating illness
Uncomplicated hemorrhoids (minimal bleeding with no iron deficiency,
no thrombosis or abscess
Cosmetic surgery or services.
Sexual reassignment surgery and related treatment. If an Inmate has
commenced a course of treatment, including prescription medications, for
reassignment prior to incarceration he/she shall be evaluated by the NaphCare
Medical Director and medically necessary treatment may be continued to
prevent complications. In no event shall this limited treatment include surgery.

Sterilization.

Mammoplastics performed for augmentation or prosthetic implants.

Surgical or dental procedures to correct congenital or developmental
malformations, unless medically necessary.

Penile Prostheses.

Infectious Disease
    Antivirals for the common cold
    Prophylaxis for genital herpes unless 4 or more recurrences yearly. (Herpes is not curable.)
    Uncomplicated fungal infections of nails.

Dermatological conditions:
    Dry skin with no evidence of skin disease
    Keloid scars unless functional impairment
    Other old scars, tattoos, etc.
Dermatological specialty consultations for:
    Acne
    Psoriasis unless major
    Minor eczema
    Benign warts or skin tags
    Keloid folliculitis
    Keloid scars unless functional impairment



Dental

    Surgical or dental procedures to correct congenital or developmental malformations, unless medically necessary.

    Gold or porcelain dental restorations.

    Routine prophylactic dental care.

1.    Dental bleaching, implants, or sealant.

2.    Orthodontics, unless an exception is granted by the Utilization Review Committee.

    Temporal joint dysfunction appliance therapy, unless pre-authorized.

    Dental cosmetic procedures.

    Dental appliances solely for aesthetics.

    Occlusal adjustments.

Frenectomies, unless needed for prosthesis placement.

Ligation of impacted teeth.

Dental night guards, unless pre-authorized.

Ectopic eruption appliances.

Habit appliances and interceptive orthodontics, unless pre-authorized.

Pharmaceuticals
OTC's except for specific diagnosis documented at sick call: Tylenol, decongestants,
    antihistamines.
Vaseline or other lubricant.
Narcotics except for specific short-term diagnosis, cancer, or diagnosis confining the
    patient to a health care observation unit.
Anxiolytics except short-term for agitation leading to clearcut behavioral issues.
Sleep medications
Non-formulary medications except by special request with review for approval. (The
formulary is written to cover all essential health care issues. If any issue is deemed by a
provider not to be adequately covered, appropriate medication can be immediately
approved and provided on phone approval of the medical director or his/her designee

Pharmaceuticals, which are experimental or are not approved by the U.S. Food and Drug
Administration for general marketing or are otherwise not generally, recognized as
suitable or appropriate for treatment of the diagnosed medical condition.

Prescription or over the counter drugs to assist Inmate with stopping their smoking habits.

Other:
Newborn or nursery care.

Any medical, surgical (including implants), or other health care procedure,
service, drug or device which:

♦    Is not required because of disease, illness or injury and is not
     performed for the primary purpose of preventing, improving or
     stabilizing a disease, illness or injury.

- Is not supported by sufficient evidence to indicate that the service will directly improve the length or quality of the Inmate's life.

- Is not supported by sufficient evidence to draw conclusions. Indications of sufficient evidence is demonstrated by:

  - Concurrence through peer review.
  - Well controlled studies.
  - Study outcomes, which are directly or indirectly related to the length or quality of life, and Reproducibility, both within and outside research settings.
  - Does not have expected beneficial effects on the length or quality of life, or does not outweigh its expected harmful effects.

Any treatment which is not the most cost effective method available to address the disease, illness or injury. (Cost effective meaning there is no other equally effective intervention available or suitable for the Inmate which is more conservative or substantially less costly)

Organ transplants, including stem-cell infusion or replacement, unless by exception and pre-authorized. This exclusion does not apply to blood transfusions.

Routine Hemodialysis on a Community Inpatient Basis

Biofeedback and acupuncture.

Weight reduction programs, unless medically necessary.

Chiropractic or naturopathic services.

Pre or post incarceration treatment

Treatment provided to an Inmate while she/he is on "escape" status and is not under the Department's jurisdiction.

Organ transplant donor services when the Inmate serves as the donor.

Custodial care in non-Department of Corrections facilities.

Unauthorized services, except in an emergency situation. It is NaphCare policy that all offsite services will go through an authorization process. This process is not designed to deny care but to assure that the care path chosen is the most efficient financially and functionally for NaphCare and for the department of

corrections when compared to other approaches which can achieve the same or similar outcome.

All elective medical and dental services. Elective will be defined as any procedure or treatment which if left undone will not lead to progressive deterioration in the patient's health or place the patient at risk for death or serious health consequences.

Pre-existing conditions, unless such treatment is required to prevent significant deterioration in the Inmate's health or permanent functional impairment.

Reimbursement for services covered by other health care coverage, including Worker Compensation.

Transcutaneous nerve stimulator units (TENS), unless pre-authorized.

Bone growth stimulators, unless for long bones and pre-authorized.

Any care, treatment, services or supplies other than those which are certified by a NaphCare health care provider as being medically necessary for the treatment of the injury or disease.

Physicians' Meeting Agenda expanded outline
Song discussion
Complexity of Correctional health Paradox/ambiguity
Sociologic, legal, and ethical context of correctional health
    Why do you work?
    Why prison? Correctional health?
    Whom do you work for?
        Remuneration
    Entitlement/Justice in the societal context  Hypothetical case"benefit package."
    Legal – a legal frontier in health entitlement with boundaries still being defined.
    Psychological aspects of correctional health
        Dependency

Segment from the symptoms lecture

Defining the task
    Definition  The "touchstone" of correctional health
    "Wellness" definition issues

C.)    We must learn to maintain focus and constantly remind each other of our focus - to recognize every inmate encounter as an opportunity to discover/uncover threats to the health of the inmate and/or the inmate population. Identifying health care needs is often not the primary concern of the patients themselves or of the DOC, who both frequently have secondary interests which are not directed toward good health, but toward some other agenda. Our patients are often more interested in seeking the rewards of bad health than in seeking good health. As you know, the rewards of bad health are among the most prized commodities in the correctional environment and include: Narcotics, other pharmaceuticals, special housing and bunking considerations, special and extra diets, special work assignments or nonwork assignments, special clothing considerations (especially footwear), emotional crutches and the protection that comes from invalid status, etc., etc. Our job is not to reward illness but to reward health and treat illness. In that sense we are often going to be in a position where we are not serving the "needs" of our primary clients (the patients) as they see things from a nonmedical point of view. As we practice in this environment we must be aware of the secondary gain issues which are unique to the environment. Bartering and power-posturing are two constants in the daily life and survival repertoire of the inmate population. We must be aware of the ways in which we participate knowingly and unknowingly in that system by benefits, commodities, and privileges we provide. Failure to maintain a clear medical focus frequently makes us and our patients victims of those systems.

D.)    Because of these conflicting agendas we must be clear about what a real health care need is. In this regard it helps us to keep in our minds a clear concept of our central task which is medical treatment. Treatment should be defined in the medical sense as action taken on behalf of the patient to enhance the health, functional capacity, or longevity of the patient. Any actions we take which diminish the functionality or health quality of an individual do not serve our mission.

Risk/benefit issues
Cost/benefit issues
    Fiscal responsibility
    "Waste"
Prioritization "Acuity"

Song

Engineering/Architecture of correctional health
    Task flow  Problem – solution – resources – outcome
    Examination of resource components
    Leadership
        Quality
        Efficiency  Outcome:waste ratio

Maximizing internal resources
        Equipment
        Services
        Personnel Training
        Personnel numbers.
        Prioritization of personnel assignments

Offsite resources
    Covererd services
    Appropriate referral
        Clear definition of problem requiring referral
        Clear definition of what is to be gained by the referral
        Complete and adequate preparation of the patient for referral
        Complete communication of relevant data from primary care to consultant.
        Documentation of discussion with the consultant of complex patients
        Documentation of use of consult information
        Clear definition of expectations from any follow-up.

UM
    Self management
    Quality review at least monthly at the site.
    Quality review with the ADOC medical director at least monthly.

Plans for the future structure of ADOC health care
    Use of 1 or 2 offsite institutions to provide at least 80% of offsite services.
Currently we are most advanced in negotiations with Jackson hospital and Carraway.

Ramping up onsite care at institutions that are closest to these sites. Current choices are Kilby, St. Clair, and Donaldson, and possibly Limestone.

Increased physician and midlevel staffing and coverage with onsite provider 16-18 hours a day.

Upgrade infirmary capabilities including technical resources and personnel skills to at least the level of a regular floor of any hospital in the state.

Aggressively identify acuity levels of patients at each of the other institutions

Move all high acuity patients to one of the high acuity institutions.

The obvious corollary to this is to remove all high acuity patients from other institutions. This includes removal of high acuity diabetics from Easterling and possibly high acuity mental health patients from Bullock unless mental health issues and therapeutic options override this. Bullock may remain in an intermediate category for acuity using Jackson hospital if needed for tertiary care. This would include, where possible removing high acuity patients from Hamilton. To this end, Hamilton would house only patients who are either low acuity with primarily nursing home type needs, or patients who have made a very clear DNR including "Do-not-hospitalize" declaration.

Intake and annual data checklist
ENTER RESULTS AND DATE

| Name | | AIS | Institution | DOB | Age |
|------|--|-----|-------------|-----|-----|
| | | | | | |

For each item below enter the completion date and the result where appropriate

| Date | | | | | |
|------|--|--|--|--|--|
| Screening history | | | | | |
| Exam completed | | | | | |
| PPD administered | | | | | |
| PPD result in mm with date. | | | | | |
| RPR | | | | | |
| HIV | | | | | |
| Hct | | | | | |
| FSBS | | | | | |
| Pregnancy test | | | | | |
| U/A | | | | | |
| | | | | | |
| Sick call explained | | | | | |
| PAP | | | | | |
| GC | | | | | |
| Chlamydia | | | | | |
| Hepatitis A #1 | | | | | |
| Hepatitis A #2 | | | | | |
| Hepatitis B #1 | | | | | |
| Hepatitis B #2 | | | | | |
| Hepatitis B #3 | | | | | |
| Influenza | | | | | |
| Pneumococcus | | | | | |
| Tetanus | | | | | |
| | | | | | |
| | | | | | |

Intake Review

Name: _____, DOB: _____, Facility: _____, Date: _____

| Test | Result | | |
|------|--------|---|---|
| Weight | BP | Allergies: | |
| Date and result of: | Last PPD | HIV | |
| | RPR (last) | FBS | |
| | Last CXR | | |
| Pending orders | | | |
| Pending appointments | | | |
| Active Mental Health Issues | | | |
| Recurrent Lab Needs | | | |
| Problem list complete with all active medical, dental problems | | Y, N. | |
| High-risk conditions: | | | |
| Chronic Care Clinics | | | |
| General appearance: General behavior: | | | |
| Physical deformities or evidence of abuse or trauma: | | | |
| Active Medications: | | | |
| Nonformulary medications: | | | |
| Disposition: Population  Y, N Referral to: _____ | | | |

Reviewers name: _____, Signature: _____

Request for Special Needs Medical Review

Name: _____, Fac:_____, Date of request:_____

Provider's diagnosis related to request:_____

Tests related to this diagnosis with results and date: _____

_____

_____

_____

Specific physical observations related to patient's request, (deformity, ROM, etc.) _____

_____

_____

Other pertinent diagnoses: _____

Potential consequences to the patient without restrictions or modification of acivity: _____

_____

_____

Security staff observations regarding current activity if any: _____

_____

Management options other than requested modification if any: _____

_____

Provider name: _____, Date: _____

DOC medical review and comments: _____

_____

_____

Approved, Disapproved   DOC reviewer: _____, Date: _____

Request for Special Diet or Diet Supplements Provider Review

Name:_____, Facility:_____, Date of Review:_____

Diet or supplement requested: _____

Diagnosis supporting request with date diagnosis made: _____

_____

Data supporting diagnosis: _____

_____

Serial weights:  2 yrs ago: _____, 1 yr: _____, 1-2 mo:_____, Current:_____

Other pertinent physical exam findings: _____

_____

Hct: _____,   WBC: _____, Lymphs:_____

Total protein: _____Albumin_____, Prealbumin: _____

DOC review with comments: _____

Reviewed by: _____, Date: _____, Approved, Disapproved

Medical profiles staff data:

Inmate name:_____, AIS:_____, Date:_____

Observed activities of the patient: _____
_____
_____
_____
_____

Problems the patient displays with any activities: _____
_____
_____
_____

Observed dietary habits of the patient: _____
_____
_____

Observed problems of medication usage:_____
_____

Officer name:_____, Signature:_____

I have been informed of the above observations:  Patient signature:_____

### Grievance Management**

A nursing level (RN) staff person should be assigned to review all grievances as they are submitted. This person will be designated as the grievance coordinator.

The grievance and the chart should be reviewed within 24 hours of the next working day after the grievance is received.

The grievance coordinator should complete a summary of the grievance as outlined on the grievance review form using information derived from a review of the patient's record.

The information retrieved should be reviewed by the grievance coordinator with the primary provider for that patient within 2 days.

Within 3 days the grievance coordinator should have a visit with the grieving patient and the primary provider. At that visit the goal should be to assure that the assessment of the patient has been complete and thorough, that the previous decisions have been appropriate, and that the patient is clearly told about the decision and the reason for the decision. It is clear that the patient may continue to disagree with the decision; the important thing is that all questions be answered and that an appropriate medical decision and response be made to the issue presented.

The primary care physician should complete a review on the grievance response form. The completed form should be submitted to the site medical director for review.

After review, a copy of the form should be sent to UR at the Division of Correctional Health.

**All legal proceedings arising from issues regarding inmate health care should be dealt with by the same procedure as outlined above. The Grievance form should also be used to provide background data on these patients to the Division of Correctional Health.

Grievance Response Form

Name: _____, MDOC#: _____, Facility: _____, Date: _____

*Brief* summary of patient complaint: _____

_____

_____

_____

Clinical summary of patient's documented health issues (include history, exam, pertinent lab, etc.): _____

_____

_____

_____

_____

_____

_____

Most likely diagnoses: _____, _____, _____

Clinician's impression of situation: _____

_____

_____

_____

Clinician's recommendations: _____

_____

_____

Name of provider: _____, Signature: _____

Medical Director's Review, Recommendations, and Comments: _____

_____

_____

Medical Director's Signature: _____

DEATH SUMMARY

I.     Presentation of Case
       a.    Past Medical History:

       b.    Presentation of Present Illness:

       c.    Medications:

       d.    Procedures / Tests Done On This Patient:

       e.    Response / Outcome:

II.    Differential Diagnosis:

III.   Clinical Diagnoses:

IV.    Pathological Discussion and Laboratory Results:

V.     Anatomical Diagnosis: (For Patients Who Have Autopsy)

VI.    Case Summary / Probable Cause of Death:

VII.   Retrospective Review of any Existing Data Which Might Have Suggested Preventive Health
       Measures for this Case:

VIII.  Review of Missing Data Which Could be Helpful in Cases of this Nature:

IX.    Recommendations for Modifications in Protocol, Procedure, or Approach to Patient
       Management Which Might Result from this Review:

_____  ___/___/_____  _____
Inmate name                  Age   Date of death   Physican reviewer

Death Review

Name: _____, Age/Race/Gender: _____, Facility _____

History of illness prior to death, pertinent physical, lab, Xray, and consultation data and diagnosis or differential dx:

_____

_____

_____

_____

Medications at onset of acute event: _____

_____

Description of events surrounding terminal event including subjective information, physical exam, lab, Xray, or other data

_____

_____

_____

_____

Medications/interventions in managing the acute event:

_____

_____

Autopsy data: _____

_____

Case summary including probable cause of death: _____

_____

_____

_____

Identify prior available data which could possibly have lead to other management considerations: _____

_____

_____

Other data which could have potentially been useful in management: _____

_____

Recommendations for modifications in protocol, procedure or approach to patient management which might result from

this review: _____

_____

_____

Reviewing physician:

I am sorry not to have had more time to spend with you, but I have gotten at least to meet most of you at this time. I appreciate the work that all of you are doing.

I have said to most of you that, as we have begun to have personnel to work as central management for health care in the DOC, we will be developing a system to put into place which will not change from month to month or year to year depending on local, state or national practices unique to various vendors and changing even for the same vendor as leadership changes. I believe the stability created by this will be welcomed even by the vendor(s).

What this means is that correctional health of the Alabama DOC will have a system for providing and assessing health care that will be done by any and every vendor. And that means (**Oh no!**) another change as we put that system in place.

I know that change is difficult and I would like to complete and introduce the system all at once, but based on the review of the monitor we received at St. Clair, I do not feel we should wait on that at this point. He made it very clear that his major concern for our system related to offsite management. That is also a major concern of the plaitiff's attorney and certainly of mine.

In our exit conference Dr. Robertson made this issue the central focus of his review. He was concerned about the cumbersome nature of the process. In the meeting he made it very clear that his concern was about *those referral cases which could have major consequences for the patient*. He also volunteered, without being prompted, that his past experience as a medical director caused him to believe that about 10-15% of all requests for referral would fall into this category. While he did not want us to focus on these numbers, we did begin in our discussion to refer to these patients of concern (with the plaintiff's lawyer present) as "the 10-15 % group." Dr. Robertson did indicate that he would prefer to call this the higher acuity group.

We also in this conference agreed that we could define this group as those patients who have problems which, if not optimally managed, have some likelihood of suffering serious or significant health consequences or even death. We also agreed that "the gold standard" of medical decision making by the "perfect doctor" would be to identify the persons who belong in this group with 100% accuracy. That means to define a population in which **every person** in the group was likely to have serious consequences without intervention , and **no persons** are in the group whose problem would not end seriously. That is, of course, *an impossible goal to achieve*, but **it is the standard** by which every referral should be measured **and it is the standard** by which we, as medical management for ADOC, wish to measure the performance of our vendor.

**Let me make this completely clear. Do we expect this standard to be 100% met? Of coarse not!** Should any student expect to make 100 on every test? You know the answer. But that does not mean that we should stop giving grades. In our case it does not mean that we should not start giving grades.

Now there is also a major question of priority here. **It is better** from our point of view to have too many patients in the group than to have too few. If you are going to fail, our first concern is for the patients and you will be graded much more strictly for incorrect omissions than for too many inclusions. Having said that, you will be considered off the mark for either and the gold standard remains perfection.

Now, how do you go about achieving the goals implied by this standard? Having had the responsibility for implementing this task in Arkansas, Maryland, Virginia,

Mississippi, Alabama, and South Carolina I know a great deal about the tensions that such implementation can create and the difficulty of forming a working team of independent-minded (?ego driven maybe?) physicians and professionals toward accomplishing this mission. No one wants to be in a responsible position and feel intellectually castrated. In younger years (ah, the privilege of thinking and speaking as an old man) (venerable age?) I was much overly directive toward providers under my supervision in trying to achieve this goal, yet I did learn a great deal and was somewhat successful in building a team which was successful at the goal. I believe the best approach to this task is to allow you to make your own decisions and then to assess your effectiveness retrospectively. That is, I believe, "the American way." We set out a task and we look for a team of people who sign on because they believe that can do the task as well or better than anyone else. That team is you, PHS. Our job at DOC is to assess whether you are accomplishing the task. The final result of that task is your list of 20, 30, 50 (whatever) patients who are at high risk for serious illness.

But there is more to the task than assigning risk to the patient, which is what the above process is really all about. The second part of the task is to find a way to best protect the patient from the consequences of that risk. The gold standard for us in this task to avoid waste is that you:

1. Do **everything** you can that reduces the patient risk (make the patient better)
2. Do **nothing** that does not reduce the risk (make the patient better.)

Again, this is a task that is not possible to achieve to perfection but it is a standard against which we will measure your performance. Before you order a lab test, an Xray, order a medication (formulary or nonformulary) or request a consult on a patient, you should answer for yourself the following question: What do I expect to receive from this test or treatment or consultation that will make the patient better? After completion you should ask yourself the same question and at that point you should have the answer. How is the patient better off as a result of the procedure I have initiated? In particular you should answer the question: is the patient worse off as a result of what I have just done? Consider side effects of medications, drug dependency and the traumatic consequences of various interventions.

Finally (and I am always a bit suspicious when anyone says this is the least important) we must look at the financial consequences of what we do. Unless we are personally funding the care (which we would welcome on your part but have little expectation of receiving) we must recognize that every order that flows from our pens bears a price tag that is sent to the people who are paying the bill.

On this I speak from the perspective of one who started 2 years ago as the medical director for Cullman's Good Samaritan clinic where free care is provided for those who **are employed** but have no health insurance and cannot pay their own way. I can tell you these patient have no way or hope in the American system of ever getting a total knee, a lipoma removed, special shoes, epidural injections, etc, etc. unless they come with check in hand. They could get into the ER if they were having an MI. And care would be given. But they could never leave the ER with a promise of a hernia repair. These are some of the people who are paying a part of the bill on every test you order. At the same time they are working to support the education and often food and housing of the families of the patients for whom you care. In saying this I do not imply any negativity toward or

bias against our clients. They are our patients and as such our sacred trust. We act on their behalf *but* with resources given to us by others - unless you are one of those special few who choose to do this without pay (excuse the obvious sarcasm.) The statements above regarding the fare of those who provide our support are simply statements of fact. They describe the way life is out there in "the real world" for an ever growing segment (tens of millions) of our citizenry.

**This does not mean that we do not care for (and care with compassion) for the patients who are in our charge. But we cannot do so with the cavalier attitude that our fiscal responsibility and efficiency with the money of others makes no difference. It is the height of arrogance to assume that we are entitled to spend funds given to us (often unwillingly) by others with no regard to fiscal responsibility.**

It is unfortunately the fallacious thinking of many physicians [and other professionals (human beings)] that once they have given enough right answers on a board test to receive a license, they should no longer be submitted to the humiliation of testing. That suggests to me the egocentricity of our thinking. Getting the right answer on a board question pales in significance to the task of getting the right answer on every patient you confront. In fact the task is so daunting that it is better not left to a single person. Daily I find myself in practice forgetting to order a test on a patient that I dreamed of the night before. Or I catch myself failing to follow up on a test report I have already ordered. Rather than resent, I find I must welcome the scrutiny of others over the care I give. That scrutiny is to the benefit of the patient and in the long run that (benefit of the patient) is what really matters.

At any rate, what I propose is not oversight but teamwork. I believe that given the monumental difficulty of the task as outlined above, we need all of our heads working together. The argument may be made that that is too time costly. I beg to differ. If the first step is done (prioritizing patients by acuity) and done well, each of you have only 100 to 200 max such patients who require in-depth attention and consultative management. You must learn to devote at least half of your work time to these. The rest can be cared for by practitioners or nurses with modest assistance.

Having tomed (Don't you think we could make "tomed" a word, John? I think its *doable*.) on all of this there is a bottom line. The above is my best attempt to explain and perhaps to justify the bottom line. Justification (another way of saying "being right") is important to me. (An incredible demonstration of false pride I might add.) That means if I am wrong, I want your help to correct things. I would rather be humiliated than wrong. (I don't really care for either one.) Since what I have written above forms the justification for the requirements that follow you should take every advantage to correct my errors.

For now, beginning the first of the year, it is my plan to require that for every offsite referral the following be sent to the DOC central office or preferably emailed as an appendage to me.

1. An H&P by the appropriate DOC form. This may be completed by a midlevel provider and even some of it by nurses once you decide you want to make a referral but you need to be accountable for all the information on it. Any patient with a problem great enough to require transportation, the time of 2 officers, the expense of a consultation, should require that you have a complete grasp of the patient's health issues. This applies also to patients sent to the hospital for admission. For emergency admissions the nurse should be asked to complete the short form but the more complete form should be completed from the chart and sent ASAP

2. Offsite referral checklist of items to be sent with the patient when he/she leaves the institution to be included in a packet delivered to the provider and signed by the offsite provider or his office nurse.

3. Return from offsite visit.

4. All deaths should have a death review form completed.

All of the above documents should be added to the chart in the consultation section of the chart.

Why do we want these documents?
Taking seriously our part in the health care mission of the ADOC we need to do the following:

1. Review the histories of those patients whose illness reaches a level beyond our capability to handle onsite and assess whether there are areas of preventive care which might be implemented to prevent such illnesses.

2. Review the role of chronic care clinics in managing the various diagnoses. Does the number of chronic care clinics need to be increased?

3. Review the kinds of offsite requirements to see if we can enhance onsite capabilities to be able to handle more of the health care at the institution. For example should we enhance Xray capabilities, Xray hours, lab capabilities, lab turn-around time, special procedures like GXT's, Echocardiograms, other Doppler studies, onsite surgery capabilities, endoscopy (GI, GU, pulmonary). These and others need to be constantly considered as upgrades.

4. Review the infirmary capabilities of our institutions to include beds, staffing, equipment. It is our goal and our intent that we should be able to care for any patient at the same level as a non-monitored hospital bed. As a person who hospitalizes patients regularly, I am aware that over half the admissions to a general hospital are made by and managed by family practitioners and general internists. It is our expectation that the physicians employed by our vendors practice at that level. This does not, of course, include patients who require or are likely to require ICU or monitored care. If a patient goes out "because they need monitored care" and end up in the hospital without monitored care we have missed the mark in our assessment of the patient. It is also the expectation of the DOC that all infirmary nurses of the vendor be ACLS trained and be qualified to work on the regular floor of any hospital in the state.

5. Track the follow up of our patients to be certain that the data we "purchase" from the outside is used for the patients benefit and is not lost. To be sure to be proactive in follow up care and prevent follow-up lags.

6. Most importantly we need this information to participate with you in a consultative role. We remain firmly convinced that no matter how weak or strong our abilities and education, every player at some point will have something important to offer or suggest regarding the care of a given patient. The least bright of us will know something you don't. The brightest of you will have holes in your knowledge. While you are the quarterback for care of your patient you cannot do your job as well alone as you can with the assistance of your blockers and receivers.

7. Coordinate system resources. It is essential for all of us to realize that we are part of a system. Perhaps a skill you lack is available at another institution. Our patients can be moved.

8. Assure that system-wide the team has the skills necessary to manage most of our primary care needs. It is not satisfactory to us as ADOC that your health care team would necessitate and offsite referral for an ingrown toenail or skin biopsy.

9. Assess placement of our patients. For example the need to move prerenal patients to Kilby ASAP.

10. Assess referral patterns and responses. Does our offsite network and coverage differ from location to location. Would it be better to have patients needing general surgery in north Alabama and those needing cancer care in central Alabama due to the availability of offsite consultants, etc.

Offsite Referral Process

1.) Provider determines a specific issue with which assistance is needed either for diagnosis or treatment.
2.) Provider should attempt (within constraints of the time urgency of the situation) to define the exact nature of the problem identifying it as one of the following:
   a.)  A specific complaint or abnormality (lab or physical finding or other abnormality needing investigation or resolution.)
   b.)  Suspected diagnosis or
   c.)  An appropriate differential diagnosis for the problem.
3.)  The provider should immediately prioritize the issue with which he is faced (based on a review of the differential diagnosis) and determine whether the situation is most likely:

 A.) acute and possibly self limiting?
 B.) Acute and requiring immediate intervention, i.e. AMI, acute stroke, active bleed, etc.
 C.) Acute but requiring (or benefiting from) less urgent intervention – possible TB, Anemia without bleed and with stable vital signs, FUO, kidney stone, atrial fibrillation, etc?
 D.)Chronic with no urgency for immediate intervention?
 E.) Chronic with a component which requires acute intervention (i.e.. diabetic ketoacidosis or hypertensive crisis?)
 F.) Either acute or chronic where the differential diagnosis does not include an illness that can be effectively treated i.e. metastatic cancer, scoliosis,  end stage liver disease. A list of such patients should be maintained at each institution. This is a list which should be discussed and built in consultation between the DOC and the contract provider.
 G.) Problems whose differential contains only problems whose treatment is cosmetic, for convenience, or does not offer significant functional or survival benefits ie, lipoma, chronic back pain, etc. .

 In those situations where the priority level is not high  (either in terms of the consequences of taking no action or in terms of time urgency for dealing with the problem) it is often the best health care management to watch expectantly and do nothing.  Much too often patients with an illness like acute gastroenteritis are subjected to tests such as barium enemas or even colonoscopies which add nothing to the diagnosis of that entity and in fact may further compromise the patient's health with worsening dehydration, prolonging nutritional recovery , and increasing patient discomfort.  A turned swollen ankle on Friday afternoon will not receive enhanced therapy by Xray in the emergency room that night, and in fact may have declared itself to be better by Monday and require no Xray at all.  Time and nature are  not only great healers but are also often great diagnosticians and more safe and healthy than any more aggressive interventional option.

4.)  If the problem presenting to the clinician is a true emergency (in the urgent category) the physician should initiate a response calling to make appropriate contacts for referral and/or ambulance transport and then  contact the  corporate Medical Director or the UM Director for an approval number which allows the receiving institution and physician to be reimbursed for their services.  That call should be placed as soon as the patient is stabilized for transport or is in a stable environment regardless of the day or time.  Someone representing UM at corporate level should be available for phone consultation 24-7 on some sort of rotating call schedule. This can be assigned on a rotating basis to regional medical directors or selected institutional medical directors.
5.)  As the patient is being prepared for transfer the physician should give first priority to caring for the needs of the patient.  If time allows the Referral Information checklist and the Emergency Referral sheet **"Consult for Emergency Treatment"** should be completed to provide the receiving clinician and institution as much information as possible.  If the site clinician is not available, the "Consult for Emergency Treatment" should be filled out as completely as possible by the nurse or other attending staff. At some times in some institutions this may be a correctional officer.  Whoever is doing it should complete as much as possible of the "Consult for Emergency Treatment" after consulting by phone with the Corporate Medical Director or the Corporate Director for UR for assistance with the information.  No one should attempt to gather or transmit information which they are not qualified to gather.
6.)  After completed, a copy of the Emergency referral sheet should be made and filed with the site UR nurse on the next working day.  If the patient leaves before this sheet can be completed, it should be

completed after the patient leaves and the original filed with the UR nurse. A copy should also be faxed to the corporate office and to the Corporate Medical Director. A copy should also be transmitted to the offsite providers whether ER or floor of admission.

7.) For all referrals with a lesser priority, the Medical Director of the institution should review the patient and secure as much as possible of the data requested on the **form "History and Physical for Offsite Referral."** At those institution where there are other staff physicians under the Medical Director, they should complete the History and Physical for referral and the Medical Director should complete the form **"Medical Director Review for Offsite Referral."**

8.) If, after completing this document, the site Medical Director agrees that referral will produce the best result for managing this patient, the Medical Director and/or the UR nurse should discuss with the Corporate Medical Director the accumulated information, the patient, and the planned referral. Together they will formulate a plan for the most effective and efficient management of the particular patient problem in view of the unique site and offsite resources and capabilities of the facility.

9.) The time for such case discussions between the site medical director and the corporate medical director should be scheduled for certain times once or twice a week except for emergency cases.

10.) The UR nurse or designated UR person at the institution will then take that recommendation and obtain a date for the service being requested. This will be done by an offsite coordinator for each of the 2 major areas. Currently this is Karen Valentine at Carraway and yet to be determined at Jackson.

11.) Thereafter the UR nurse will again contact the Corporate Medical Director to obtain an approval number which will include within it the date of service.

12.) The UR nurse will notify the primary care physician of the scheduled appointment and date and will maintain a calendar file of all scheduled offsite appointments.

13.) The UR nurse should have a log of all requests for referral which includes date of request by the provider which should be the date of the receipt of the H&P for offsite activity. It should also indicate the date of any discussion with the corporate medical director, the response, the proposed date for the appointment.

14.) The date for the appointment should be returned to the primary care physician which should be reviewed along with the H&P and the original request to determine whether additional care should be rendered at the institution or perhaps whether the appointment needs to be expedited.

15.) In every case the patient should be seen by the site physician within 30 days of his (the physician's) initial referral to assess status of the patient and status of the consult. Where appropriate the patient should be seen sooner.

16.) Prior to the date of referral, the primary care physician will complete a **"Referral Information Checklist"** which will let the nurses know all the data which must be generated and assembled before the date of the appointment and which must accompany the patient to the appointment.

17.) Prior to leaving the institution, the patient should be checked out by a nurse (either the UR nurse or his/her designee) to assure that all the data indicated by the checklist is with the patient at the time of departure including hard copies of Xrays where appropriate.

18.) Nearly every packet being sent out with an inmate should contain a recent H&P completed on the form "H&P for Referral." This provides the consultant with a good overview of the clinical status of the patient and also gives clear directions about what is needed and expected of the consultant. Attached to the outside of each packet should be the Offsite Referral Check List and the form **"Report of the Consultant."**

19.) On return from the offsite visit the patient should be seen by a nurse in the clinic and the form **"Return from Offsite Referral"** should be completed. At that time the form **"Report of the Consultant"** should be reviewed for any recommendations or scheduling issues.

20.) The physician or provider should be called by the nurse at that time to give orders for any medications recommended by the consultant or any tests suggested.

21.) An appointment should be made for the patient to visit the clinician within 24 hours of the next regular work day. At that point the the patient should be re-examined in the light of the findings and recommendations of the consultant and the management plan should be reviewed and any changes discussed with the patient. The report of the consultant should be treated as a *recommended* plan. The decision to implement the recommendations is the responsibility of the primary care physician. His judgement which may include data not available to the consultant should supersede that of the consultant. The bottom line is that the site physician should be clinically responsible for any treatment or diagnostic interventions undertaken whether or not those are recommended by a consultant. Of

course overriding a recommendation must be soundly clinically based and clearly supported by standard of care and available clinical data on the patient. Discussion of such a decision with a regional or corporate medical director should be considered.

22.) Follow-up appointments require recertification through the Corporate Medical Director or UR Director. The need for follow-up will be based on an assessment of what specific contribution the follow-up will make toward achieving the defined outcome goal for the patient. Initiative of the primary care physician is welcome in this process. If the site physician does not wish to abdicate this decision to the state medical director, then it is incumbent on the primary care MD to ask and answer the question, "What clinical gain will accrue from sending the patient for the follow up visit.?"

23.) If recommendation of the consultant includes the need for hospitalization all of the data obtained for the initial referral should be up dated and sent with the patient.

24.) An offsite referral log should be maintained and an entry made for every person who leaves the institution for health care reasons.

25.) This should be sent daily to DOC at the office of the associate commissioner for health care.

26.) Within one month of any offsite occurrence an offsite QA should be completed using the form "Review of offsite referrals." This review may encompass multiple referrals. It should not, however be delayed if offsite activity is still in progress.

27.) A copy of this review should be submitted to the DOC office of the associate commissioner for health care.

History and Physical for Offsite Referral

Date: _____ Name: _____ DOC# _____ SS#_____ DOB: _____

Facility: _____ Staff MD _____ Phone #: _____ Referred to: _____

History of present illness (include any medical data predating entry to the DOC)_____

_____

_____

_____

_____

_____

_____

II. Purpose for (goal to be achieved by) the consult: _____

III. Past Medical History: _____

_____

_____

IV. Current Health Status(Circle all positives and describe positives by number in space below.)

| 1.Seizures | 7.tuberculosis | 12.Peptic ulcer | 17.renal stones | 20.peripheral vasc dz |
| 2.Stroke | 8.coronary art dz | 13.Inflammatory bowel | 18.renal failure | 22.hematologic dz |
| 3.Intracranial dz | 9.valvular heart dz | 14.Abdominal surgery | 19.prostate dz | 24.collagen vasc dz |
| 4.Eye disease | 10.myocardial dz | 15.Pancreatitis | 21.diabetes | 23.malignancy |
| 5.Thyroid dz | 11.hypertension | 16.hepatitis | 26.Skin disease | 25.Bone or joint dz |
| 6.Pulmonary dz | | | | |

### Physical exam data:

| BP | temp | Weight | | PERRL? | | | |
|---|---|---|---|---|---|---|---|
| EOMI | | Fundi | | | | | |
| Thyroid | | Nodes (cervical): | (supraclavicular) | | other | | |
| Lungs | | heart | | | | | |
| abdomen | | | | | | | |
| rectal | | | | prostate | | | |
| testes | | Pedal pulses DP (R) | DP (L) | | PT (R) | | PT (L) |
| Musculoskeltal deformity | | | | | | | |
| Skin | | | | | | | |
| Details on any of above items: | | | | | | | |

_____

_____

_____

_____

_____

_____

_____

V. Other Data (With Dates of Each); Circle Items to be completed

   1.  Chest X-Ray Report: _____
       (Actual X-Ray film must accompany patient to M.D.'s office)

   2.  Other X-Ray Reports: _____

   3.  EKG Reading: _____

   4.  Lab:  HCT:_____  WBC:_____  PLTS:_____
             BUN:_____  Creat:_____  K+:_____  LDH_____, AST (SGOT)_____
             FBS:_____  Chol:_____  Protime:_____
       U/A:  Glucose_____  Prot_____  WBC_____  RBC_____

       Other Labs:_____

   5.  Other diagnostic procedure results: _____

_____

_____

VI. Medications and doses:_____

_____

VIII. Smoker  Y  N  Packs?_____  Years?_____, Current cigarettes/day _____

Current Working Diagnosis: _____

Other Ddx: _____  _____  _____

_____

Treatment attempted to date and response to treatment:_____

_____

_____

_____

Other known diagnoses: _____  _____  _____

_____  _____  _____

Discussion of Developments Leading to Current Impression: _____

_____

_____

_____

Questions With Which We Need Help (please address in consult!) _____

_____

_____

Authorized Procedures with approval #: _____  _____

_____  _____

Staff Physician or Practitioner: _____

## Consult for Emergency Treatment

If this form is being completed by a staff person without medical training, complete only the information ** below about which you have knowledge. The history should simply be a statement about what seems to be the patient's problem. Physical exam is simply any visible problem (ie a cut on the arm). If answer to any ** question is unknown, *please leave it blank.*

**Name:_____, SS#: _____, **DOC#: _____, **Facility: _____

**DOB: _____, **Age: _____, **Race: ____, **Sex: ____ **Date: _____, **Time: _____,

**Brief history of current problem: _____

_____

_____

_____

_____

Physical findings:  BP:_____, RR: _____, Temp: _____, Pulse: _____

**Other physical exam findings: _____

_____

_____

_____

_____

**Known diseases or disabilities: _____

_____

**Known prior hospitalizations: _____

_____

Other prior pertinent data: _____

_____

**Medications: _____, _____, _____

_____, _____, _____

**Allergies: _____

Reason for referral (procedures authorized) and authorization numbers: 1.)_____, # _____

2.)_____, # _____, 3.)_____, # _____

If good care of this patient requires an approach not covered by these procedures please proceed and when patient is removed from the

emergency setting call: _____ at:_____

Referring MD: _____     Person sending the patient: _____

Referral Information Checklist

Name: _____, Site: _____

Unit: _____, Referring MD: _____

Site contact number re this patient: _____

This patient has been evaluated by our site physician and this referral contains the following data:

Referral Evaluation on the patient including H&P, list of current meds and allergies: _____

Lab reports as circled: Chemistry profile, CBC, protime, Other: _____

Pathology reports of: _____, _____

CXR report: _____     Copy of EKG: _____

Reports on Xray of: _____, _____, _____

CT or MRI report (circle which) of: _____, _____

Actual films of Xray, CT, or MRI of: _____, _____

_____, _____

Reports from prior consultations on this issue by : _____

Operative report regarding: _____, done on; _____

Other reports: _____, _____, _____

Documents checked above included in Offsite referral envelope by: _____

Signature: _____, Date: _____

Packet given to officer: _____

Packet delivered to: _____

Additional data requested by consultant: _____

_____, _____, _____ _____

_____, _____

Name: _____, Inmate# _____, Sending Facility_____

Date: _____

**Report of Consultant**

Brief review of historical, exam, and lab data leading to diagnosis:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Diagnosis or differential diagnosis:_____, _____

_____, _____

Recommended Diagnostic Procedures*_____

_____

Purpose for (question to be answered by) the recommended procedure;_____

_____

_____

Recommended treatment. _____

_____

_____

_____

_____

Therapeutic goal expected from the recommended treatment, and the likely best projected outcome. If current research suggests a wide range of possible outcomes please specify. (The expected outcome from a particular chemotherapeutic modality for a cancer would be an example.)

_____

_____

Page 1

Follow-up needed: Y,   N

When (time frame): _____ to _____ days / weeks / months

Specific service to be rendered at the time of follow-up. _____

_____

_____

Could follow-up be done by the referring physician? Y,  N

If not, explain: _____

_____

_____

_____


Name of consultant (print or stamp)_____

Signature of consultant:_____, Date:_____

Page 2

## Return from Offsite Consult

Name: _____, DOC#: _____, Date: _____

Subjective statement of the patient about what transpired: _____
_____
_____
_____
_____

Apparent condition of the patient on return: (Describe any scars, wounds, dressings, casts, etc.) _____
_____
_____

Any new diagnoses by the consultant: _____, _____

Recommended tests: _____, _____
_____, _____

Need or plans for hospitalization: Y, N?

If yes, for what purpose? _____

Recommended medications: _____, _____
_____, _____

MD notified of medication recommendations? Y, N

Orders for meds received from staff physician? Y, N Circle those meds above which were ordered.

Name of MD notified _____

Other recommendations of the consultant: _____
_____

Follow-up visit requested by consultant? Y, N. When? _____

Purpose of follow-up: _____

Appointment date to see staff physician for review and follow-up: _____ _____

Summary review by staff physician: _____
_____
_____
_____
_____

Name: _____, Date: _____

Return from Hospitalization

Name: _____, MDOC # _____, Date: _____

Discharge diagnoses: _____, _____, _____

_____, _____, _____

Condition of patient on arrival: _____

Describe any surgical scars, bandages, etc: _____

_____

Record any orders for PT, dressing changes, IV's, or any other nursing orders: _____

_____

_____

Recommended medications: _____, _____

_____, _____, _____

Staff MD notified by nurse of medication recommendations and all nursing orders? Y, N

Orders for meds and procedures received from staff physician? Y, N Circle those meds above which were ordered.

Name of MD notified _____

Follow-up visit requested by hospital MD's? Y, N. When? _____

Purpose of follow-up: _____

Appointment date to see staff physician for review and follow-up (no later than next regular work day): _____

Summary review by staff physician: _____

_____

_____

_____

_____

Name: _____, Date: _____

## HOSPITAL DAILY CARE REPORT

The information requested here is data the correctional staff physician is to be aware of daily as long as a patient from his/her facility is hospitalized. Information is most accurate if the hospital attending physician or someone working directly with him/her provides the information and if communication occurs directly with the director of clinical services for the Division of Correctional Health or the attending physician at the site. This data is important to us and to the patient as it allows us to plan for the ongoing care of the patient and to remain fully educated about the health issues of each of our patients. Because we are convinced that this record is essential to our providing effective care with continuity, and because assimilating this data requires considerable time, effort, and forethought, we would be happy to work with your office to assist in the assimilation and transfer of this information to us on a daily basis.

### INITIAL DATA TO BE PROVIDED DURING THE FIRST 24 HOURS OF ADMISSION

Patient Name:_____    Referring MD:_____    His/her phone #:_____    Fax #_____

Attending MD:_____    Best place and time to reach MD:_____

Key features of problem requiring admission:_____

Most likely diagnoses: 1_____    2___    3_____    4_____

Tests required to confirm each likely active Dx and planned schedule for thise tests:_____

Factors which might alter proposed diagnostic schedule:_____

Proposed treatments for the patient with frequency and duration of each, site or department where treatment to be done and position or title of treating person:_____

Endpoint which will define readiness for release from the hospital:_____    Estimated D/C date:_____

Treatment(s) which are likely to be required after discharge from hospital:_____

Please note in planning for discharge that most of our facilities have 24-hour nursing, infirmary beds with capability for IV fluid and medication administration, and daily physician visits.

Admission authorized _____ MD/Medical Director Authorization #_____

NOTE: No request for payment for care provided this patient can be made without the authorization number. Authorization numbers can be provided on retrospective review of the case, but unless approved concurrently they can also be denied.

DAILY INPATIENT REVIEW FOR DATE:_____

New diagnostic findings/diagnoses:_____

_____

_____

_____

Further diagnostic tests indicated:_____

_____

Treatment plan for this day:_____

_____

Additional planned treatments with frequency, duration, site or department, position or title of treating person_____

_____

_____

_____

Other problems or developments which require alteration of original treatment or diagnostic schedule:_____

_____

_____

Any revision of planned discharge date or post-discharge requirements:_____

_____

_____

_____

_____MD/Medical Director     Authorization #_____

Audit Offsite referrals:

| Name | | | |
|---|---|---|---|
| AIS/Age | | | |
| Site/dorm | | | |
| All problems on problem list | | | |
| Missing from problem list | | | |
| Data supporting each problem | | | |
| Data needed to complete problem assessments | | | |
| Problem leading to referral | | | |
| Adequate DDX of problem identified. | | | |
| Management changes that may have prevented need for referral. | | | |
| Data regarding problem evaluation prior to incarceration | | | |
| H&P for offsite referral adequately completed | | | |
| Offsite referral check list completed | | | |
| Expected result of referral clear | | | |
| Data to support non-elective character of referral including consequences of deferral. | | | |
| Return from offsite completed | | | |
| Report of consultant charted within 5 days of consult | | | |
| Result of all offsite procedures charted within 7 days. | | | |
| Result of consult achieves expected result | | | |
| Consultant called if result not achieved. | | | |
| Response to consultants recommendations documented | | | |
| MAR and labs reflect appropriate response to consultant recommendations. | | | |
| Potential implementation that would allow onsite management of recommendations | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |